2020 IL App (1st) 152862-U
No. 1-15-2862

SIXTH DIVISION
September 30, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County, Criminal Division. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14 CR 10366 |
| | ) | |
| WATTS BOONE, | ) | Honorable |
| | ) | Luciano Panici, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE GRIFFIN delivered the judgment of the court.
Presiding Justice Mikva and Justice Harris concurred in the judgment.

ORDER

¶ 1   *Held*:  The judgment of the Circuit Court of Cook County is affirmed. The evidence was sufficient to convict defendant of attempted murder, the trial court's admission of defendant's rap videos into evidence was not an abuse of discretion and defendant cannot demonstrate prejudice stemming from the alleged ineffectiveness of his trial counsel.

¶ 2   After a jury trial, defendant Watts Boone was convicted of the attempted first-degree murder by personal discharge of a firearm of Kiera Jones, Raven Willis and Jaqwon Jones. The trial court sentenced defendant to 29 years in prison for the attempted murder of Jaqwon, to be

served consecutively to sentences of 26 years in prison for the attempted murder of Raven and Kiera. Defendant's aggregate sentence was 55 years.

¶ 3 Defendant appeals his convictions, and challenges the sufficiency of the evidence, the trial court's decision to admit portions of his rap videos into evidence and the effectiveness of his trial counsel. We affirm the judgment of the Circuit Court of Cook County.

¶ 4                                    I. BACKGROUND

¶ 5 In the early morning hours of July 19, 2013, Kiera Jones (Kiera) and Raven Willis (Raven) walked to a corner store in Riverdale, Illinois. On the way there, a man with a fauxhawk haircut commented that Kiera should take her bun out of her hair. Kiera ignored the man and kept walking. After purchasing items from the store, Kiera and Raven took the same route home and walked past the man a second time. He again made an unsolicited comment, this time referring to Kiera's leggings. Kiera exclaimed, "what's your fucking point," and the two started arguing. During the argument, Kiera saw a man positioned near a car ten feet away, and noticed another man was walking into the street. She had seen all three men together on her way to the store.

¶ 6 The argument lasted three to five minutes and the sheer volume of the exchange prompted members of Kiera's family to exit their house a few doors down and see what was happening. After Kiera's cousin tried to physically remove Kiera from the argument, the man with the fauxhawk haircut said, "we got bangers," pulled a gun from his waistband and fired shots into the air. He then turned the gun on Kiera and her family, firing several shots at the group. The two other men he was with followed suit, each pointing their handguns at the group and firing several shots. Altogether the three men fired 15 to 20 shots. Kiera and her family members rushed into the home to take shelter. When inside, Kiera noticed that her cousin, 14-yeard-old Jaqwon Jones, was bleeding. He was hit by a bullet in the back.

¶ 7    Kiera's family members recognized the shooters from the neighborhood and identified the three men to law enforcement as "Savage," "Watts" and "Peanut." Based on that information, detectives from the Riverdale Police Department compiled a photo array of potential suspects and showed it to the eyewitnesses. Antwon Short (Short) was identified as "Savage" and the man with a fauxhawk haircut, who allegedly shot into the air before turning his gun on the family. Antonio Fort (Fort) was identified as "Peanut" and the man who allegedly fired a gun from a position in the street. Defendant was identified as "Watts," who allegedly fired his gun near the car. Short was taken into custody on July 27, 2013. Defendant was arrested on September 11, 2013. Fort was eventually apprehended in Indiana. Defendant, Short, and Fort, were placed in physical lineups, identified by eyewitnesses as the shooters, and charged with a litany of criminal offenses in connection with the events that unfolded on July 19, 2013.

¶ 8    Defendant was charged with the attempted first-degree murder by personal discharge of a firearm (720 ILCS 5/8-4(a), (c)(1)(C) (West 2014); *Id*. § 9-1) of each member of the group he allegedly fired upon: Kiera, her god-sister Raven, her brother Raymon Fuller (Raymon), her cousins Raheem Wilkins (Raheem) and Jaqwon, her godbrother Raquan Miles (Raquan), and friend-of-the-family Anthony Jones (Anthony). Defendant was additionally charged with the aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)) of Jaqwon, and aggravated discharge of a firearm in the direction (*Id*. § 24-1.2(a)(2)) of Kiera, Raven, Raymon, Raheem, Raquan, and Anthony.

¶ 9                                    A. Jury Trial

¶ 10    Before trial, the State dismissed several charges and expressed its intent to proceed on the (1) attempted first-degree murder of Kiera, Raven and Jaqwon, (2) aggravated battery with a firearm of Jaqwon and (3) aggravated discharge of a firearm in the direction of Raven. The matter

3

proceeded to trial before a jury on June 9, 2015. The State in opening argument told the jury that the evidence would conclusively demonstrate that defendant, Short, and Fort, all took aim and repeatedly fired their guns into Kiera, Raven and Jaqwon, with the specific intent to kill. The State asked the jury to either find defendant personally liable or to find that he was accountable for the criminal acts of his counterparts, who all shared the specific intent to kill. Defense counsel advanced an alibi defense, indicating to the jury that the evidence would show that defendant was nowhere near the scene of the alleged crimes. The following witnesses were called and gave testimony before the jury.

¶ 11                                         *i. Kiera Jones*

¶ 12    Kiera was 21 at the time of trial. She testified that after midnight, on July 19, 2013, she was at her godmother's house with a "few of [her] cousins, brothers, nieces, and nephews." The house was located at 477 Pacesetter Parkway in Riverdale. Kiera and her godsister Raven decided to go to the corner store "137th and Halsted" and walked westbound on Pacesetter. On the way there, Kiera saw a "light-skinned guy with a Frohawk and a couple of other guys standing to the side of the street." Kiera identified the man as Short. He commented that Kiera needed to take her "bun out of her hair." Kiera did not respond and kept walking. Kiera and Raven reached the store, purchased some items, and took the same path home, passing the same house where Short was standing: "465 Pacesetter." Short made another comment, this time about her "leggings."

¶ 13    Kiera testified that she said nothing at first, but then turned around and saw that Short was following her. Kiera said to Short, "dude, what's your fucking point," and they started arguing. Kiera and Short stood "three feet" away from each other. Another man, who was leaning on a car, was located to the left of Short, "ten feet" away. Kiera identified the man as defendant. A third man, who Kiera identified as Fort, was to the right of Short and walking into the street.

¶ 14    The argument lasted "three to five minutes" and members of Kiera's family came outside to see what was happening: Raymon, Raheem, Jaqwon, Raquan, and Anthony. Keira testified that Raheem came up behind Kiera and tried to grab her shoulder, but she "swatted him away." At that moment, Short said "he had big bangers," pulled a gun from his waistband and shot it into the air.

¶ 15    Kiera saw defendant laying on the car holding a gun that he was "pointing towards me and my family." Fort was in the street with a gun pointed at her "siblings." Kiera testified that Raven was behind her and Kiera's "little godsister Rhea," who was seven-years-old, was near her. Raheem, Anthony, Raymon, Jaqwon, and Raquan were "close by." Kiera did not see defendant fire his gun because she turned and started running, but she heard "15 to 20" gunshots coming from different directions. Kiera stopped and grab Rhea on the way to the house because she was "just standing there." Once inside, Kiera ran into the kitchen pantry.

¶ 16                                    *ii. Raven Willis*

¶ 17    Raven was 22 at the time of trial. She testified that in July of 2013, she lived at her mother's house located at 447 Pacesetter. On July 19, 2013, at around 12:30 a.m., she and Kiera walked down Pacesetter and saw a "young man" with a fauxhawk standing with two men. Raven identified the man with the fauxhawk as Short, and the two other men as defendant and Fort. She had seen Short "four or five times" around the neighborhood and saw Fort "around the neighborhood before," but it was the first time she saw defendant. They "were all standing by the car, a car that was in the drive-thru [sic]." Short "said something about Kiera's bun in her head." Kiera brushed off the comment and they kept walking. Once Raven and Kiera reached the corner store, they purchased "[s]nacks, chips, juice, cake" and took the same path home. The same three men were still standing outside of 465 Pacesetter by the car a "couple feet" from one another.

¶ 18    Short made a comment about Kiera's leggings, and he and Kiera started arguing. Raven testified that she was a "few feet" behind Kiera during the argument. She saw Fort move into the street and defendant stayed near the car. Raven testified that she could see all the men in her view and had an opportunity to look at their faces. Raheem came out of the house during the argument and tried to grab Kiera's arm and pull her away. Anthony, Jaqwon, Raquan, and Raymon also exited the house to see what was happening. Jaqwon and Raheem were standing next to Kiera and "the rest were back behind" Raven.

¶ 19    After Raheem tried to grab Kiera's arm, Short "pulled out a gun and shot it in the air." The gun was "black with a long clip." Raven "glanced" at defendant for "a couple of seconds" as he leaned over the car and pointed his gun at "all of us": Kiera, Raheem, Jaqwon, Anthony, Rhea and Raquan. Fort, who was standing in the street, "had a gun too" and he pointed it in the same direction. Raven heard "ten to fifteen" gunshots and ran into her house.

¶ 20                                   *iii. Jaqwon Jones*

¶ 21    Jaqwon was 14-years-old in July of 2013. Jaqwon testified that on July 19, 2013, he was at his aunt's house on Pacesetter with his cousins RaSean, Raymon, Raheem, Raquan, Raven and Kiera. That night, Raven and Kiera left the house and he heard arguing outside. Jaqwon recognized Kiera's voice. He went outside and saw a man with a "mohawk," whom he identified as Short, arguing with Kiera. Jaqwon walked up to Kiera with Raheem and they stood next to her. Raheem tried to hold Kiera back and Short said, "we got bangers." Jaqwon testified that he saw Short reach down, grab a gun from his waist and point it to the sky. Jaqwon heard a shot go off and ran to his aunt's house with his cousins. While Jaqwon was running, he bumped into Kiera and his hand hit his side. He "felt some blood," looked down and found out he was shot. When inside his aunt's

house, Jaqwon walked into her room and told her he had been shot. Jaqwon went to two hospitals and stayed overnight.

¶ 22                                             *iv. Raquan Miles*

¶ 23    Raquan was 12-years-old in July of 2013. Raquan testified that around midnight on June 18, 2013, he was with his brothers in his room. Raquan lived with his mother, brothers and sisters at a home on Pacesetter. His cousins, Jaqwon and Raven, were also there. Raquan heard arguing outside and recognized Kiera's voice, who was his older cousin. He went outside with ReSean, Raymon, Anthony, and Jaqwon and saw a man arguing with Kiera. Raquan identified the man as Short and by the nickname "Savage." He also saw "Watts" and "Peanut," whom he identified as defendant and Fort. Defendant was behind a car and Fort was walking towards the street.

¶ 24    Raquan noticed Fort reaching into his pants for a gun. He also saw Short point a gun in the air and shoot it. Raquan noticed that everybody was running. He testified that he was able to see "Peanut" in the street "firing a gun towards us." He knew the gun was firing "[b]ecause I saw the little light, and then I saw fire come out." Fort's gun was pointed "towards the family." Raquan also saw defendant leaning over the car with his right arm extended. Defendant was "firing a gun at us." Raquan knew defendant was firing a gun because he "saw the little light and fire come out." As he ran to his house, Raquan heard 15 to 20 gunshots. When he was inside, Raquan saw that Jaqwon had been shot.

¶ 25                                             *v. Officer Jeff Michalek*

¶ 26    Jeff Michalek was an evidence technician working for the Riverdale Police Department. On July 19, 2013, at around 12:50 a.m., he received a call to go to the address of 447 Pacesetter

Parkway in Riverdale. Officer Michalek testified that he walked Westbound on Pacesetter and located "five shell casings that were 40-caliber shell casings, spent shell casings from a gun." The casings were found in front of "465 and 463 Pacesetter Parkway." Officer Michalek took a picture of a red Pontiac Sunfire in the area that had a bullet hole in the right passenger side door.

¶ 27 On cross examination, Officer Michalek testified that he found 3 shotgun casings at the scene, which indicated to him that shots were fired from different directions. The shotgun casings were across the street in the driveway of 485 Pacesetter. A "wad" from one of the shotgun shells was close to where the other casings were recovered, and a shotgun "pellet" was found in the doorway of 465 Pacesetter. Officer Michalek opened the door to the Pontiac Sunfire and looked inside, but did not recover a bullet. On re-cross examination, Officer Michalek testified that the bullet hole found in the Pontiac Sunfire was not consistent with the hole a shotgun pellet would have made.

¶ 28 *vi. Sergeant Willie Darkried*

¶ 29 Sergeant Willie Darkried was a detective working for the Riverdale Police Department in July of 2013. Sergeant Darkried testified that he was assigned to investigate shootings that occurred on July 19, 2013, at 447 West Pacesetter Parkway in Riverdale. He met with Jaqwon's mother at Comer's Children's Hospital and then interviewed ReSean, Kiera, Anthony, and Raymon. Based on the information they provided, which included nicknames, a photo array was compiled. The witnesses viewed the photo array and identified photographs of Short and Fort as two of the shooters. Short was taken into custody on July 25, 2013, and placed in a physical lineup at the Riverdale Police Department on July 27, 2013. Kiera, Raquan and Raven each picked Short out of the lineup. Kiera identified Short as the man who shot into the air. Raquan identified him as

one of the individuals who shot at his family. Raven picked short out of the lineup as person who shot in the air, argued with Kiera and shot at her family.

¶ 30   Defendant was taken into custody on September 11, 2013, and placed in a physical lineup on September 12, 2013. Kiera and Raven viewed the lineup and positively identified defendant as one of the shooters. Raymon identified defendant in a lineup on September 13, 2013. Fort was apprehended in Indiana and later placed in a physical lineup on May 30, 2014. Kiera and Raymon identified Fort as the third shooter. On cross-examination, Sergeant Darkried testified that he initially "went on" the nicknames "Savage," Peanut" and "Toochie." No witnesses even mentioned that a shotgun had been fired.

¶ 31                                    *vii. Officer Glen Williams*

¶ 32   Glen Williams was a police officer working for the Riverdale Police Department in July of 2013. He was assigned to investigate a shooting incident that occurred 447 Pacesetter at around 12:50 a.m. on July 19, 2013. Office Williams testified that he, Sergeant Darkried and detective Pardon, interviewed RaSean, Raymon, Kiera, Anthony. He also interviewed Raheem and Raven. On July 22, 2013, Officer Williams spoke with Raquan and showed him a photo array in the presence of Raquan's uncle, Gordon Jones. Raquan identified defendant, Short, and Fort and wrote the words, "shot at my family," next to each of their photographs. On cross-examination, Officer Williams affirmed that Raquan referred to one of the shooters as "Toochie."

¶ 33                                    *viii. Sergeant Tony Padron*

¶ 34   Sergeant Tony Padron was working as a detective working for the Riverdale Police Department in July of 2013. He prepared photo arrays in connection with the shootings that took place on the night of July 19, 2013. He showed the photo arrays to Kiera and Raven, both of whom identified defendant, Short and Fort as the shooters. Kiera wrote on the photograph of defendant,

"guy holding the gun." On the photograph of Fort, Kiera indicated, "shooting at me." She inscribed on the photograph of Short the words "guy shooting in the air." Raven wrote on the photographs of defendant, Fort, and Short, "out there," "shooting at us," and "shot in the air," respectively. The State rested its case in chief and the defense called witnesses Michael Murzyn, Iesha Robinson, and defendant.

¶ 35                                    *ix. Lieutenant Michael Murzyn*

¶ 36    Lieutenant Michael Murzyn was a Sergeant working for the Chicago Police Department in July of 2013. Sergeant Murzyn testified that on July 19, 2013, at around 1:00 a.m., he interviewed defendant in the emergency room of Trinity Hospital. Defendant had been shot. A police report was prepared identifying defendant as the victim of an aggravated battery with a firearm. Sergeant Murzyn sent a squad car to "63rd and Eberhart" in Chicago. On cross-examination, Sergeant Muzryn testified that he spoke with defendant at approximately 1:40 a.m. on July 19, 2013.

¶ 37                                    *x. Iesha Robinson*

¶ 38    Defendant's sister, Iesha Robinson, testified that she received a call from defendant on September 19, 2013. Iesha went to "63rd and Eberhart" to pick defendant up and arrived there at 12:30 a.m. Iesha saw defendant standing on the corner, saying he was shot in the leg. She drove him to the Trinity hospital. On cross-examination, Ieshsa testified that she lived in a house on "Lowe," which was only a few blocks from Pacesetter. She denied knowing either Short or Fort.

¶ 39                                    *xi. Watts Boone*

¶ 40    Defendant testified that he lived on Rhodes Ave. in Chicago in July of 2013. He was on felony probation at the time. In the evening of July 18, 2013, defendant received a phone call from his friend "Terrell," who asked him to come to a "kickback" located "between 63rd and 62nd and Eberhart." Defendant testified that he went to the party, stayed there for "two hours" and left after

"everything happened." Defendant explained that people started arguing at the party, he walked outside and then heard gunshots. It was "after midnight." Defendant made it halfway to the corner and "everything got numb." He stayed there, "everybody was running everywhere," and he called the first number in his phone.

¶ 41    Defendant's sister, Iesha, arrived at the corner "10 to 15 minutes later" and helped him get into the car. She took him to Trinity Hospital. Defendant testified that he received a gunshot wound to the back of the right knee. At the hospital, defendant was questioned by a police officer. Defendant testified that he had no idea who shot him and indicated, "I'm not from that area, I'm not familiar." Defendant recalled hearing "eight or nine shots fired." He denied ever having shot anyone in Riverdale and denied knowing any of the people who testified in court, including Raquan.

¶ 42    On cross-examination, the prosecutor questioned defendant about his relationship with Short and Fort. Defendant admitted he knew Short, but denied being "good friends" or "close friends" with him. When asked whether he knew Short by the nickname, "Savage," defendant indicated that he only knew Short as "Coco." Defendant admitted that he knew Fort and testified they were good friends. Defendant stated that he knew Fort by the name "Grandson," but did not know that Fort went by "Peanut." Defendant's nickname was "Tuenchi." When asked by the prosecutor whether he, Short and Fort, all hung out together, defendant answered, "no." Defendant testified that "we don't all hang out at once." Defendant denied hanging out in Riverdale in July of 2013. He affirmed that Riverdale was called "Speedyville," and that Pacesetter was located there. Defendant denied that Speedyville was his, Short, and Fort's neighborhood.

¶ 43    Defendant testified that he made rap music videos and uploaded them to YouTube. One of the rap videos he made and uploaded to YouTube was titled, "Subliminal." Defendant admitted

11

that he used the name "Tuenchi" in Subliminal and that he rapped about Speedyville in the video. Defendant could not remember whether Fort was featured in the video and denied that Short went by the name "Savage." He further denied knowing whether other people called Short by the name "Savage." According to defendant, he referred to himself in the video as a savage but did not use the name "Savage." Another rap video defendant posted on YouTube was titled, "Tuenchi be da man." Defendant admitted that Short was featured in the background of the video, but denied that Short was depicted in the video holding a gun while dancing.

¶ 44 The prosecutor in a sidebar asked the trial court for permission to "confront defendant with the videos that he doesn't seem to recall two of the offenders being in and giving inconsistent answers saying he doesn't remember who was in there or not." The prosecutor further argued that the rap videos would show that defendant was "good friends" with Short and Fort, and that defendant "refers to one of the defendants in the video as Grandson," and refers to Short as "Savage." Defense counsel objected to the videos as not relevant and nothing to do with the case. After considering the arguments advanced by both parties, the trial court allowed the State to show the videos to the jury, but a "limited purpose." The trial court cautioned the State, "let's not go overboard." Defense counsel objected a second time.

¶ 45 The State played a 10 second portion of the rap video, "Tuenchi be da man," for the jury and stopped the video frame at 58 seconds. The video depicted defendant rapping with Short, who was holding a gun. Defendant identified Short as the individual depicted in the video frame and testified that Short was holding a gun in the video. The prosecutor then played a 43-second portion of the rap video, "Subliminal," for the jury. The video showed defendant rapping in a limousine with Fort seated next to him. Defense counsel objected. Defendant identified himself and Fort in the videos. When asked by the prosecutor whether "Grandson" was depicted in the video,

defendant answered "Yes." Defendant admitted that in the rap song lyrics he referred to Fort as "Grandson."

¶ 46 Defendant further testified on cross-examination that he did not call 911 after he got shot on July 19, 2013. He affirmed that the hospital paperwork where defendant was treated that day indicated that he arrived at 1:31 a.m. On redirect examination, defendant testified that he made the rap videos that were played for the jury in 2012. He denied ever having a gun on Pacesetter and denied being on Pacesetter on the night of the shootings. The defense rested. The State called the following witnesses in rebuttal: Officer Dewilda Gordon, Lieutenant Michael Muzryn, Sergeant Willie Darkried, Investigator Joseph Thomas and ReSean Carpenter.

¶ 47                                    *xii. The State's Rebuttal Witnesses*

¶ 48 Chicago Police Officer Dewilda Gordon testified that she investigated the shooting of defendant and went to his address. She was unable to locate or contact him. Officer Gordon spoke with defendant's mother, who did not provide her with a way to reach defendant. Officer Gordon could not continue with her investigation.

¶ 49 Lieutenant Muzryn testified that several hospitals were closer to the location were defendant said he was shot than Trinity Hospital, where he was taken. Sergeant Darkried testified that the address of defendant's residence appeared on a map of Riverdale. Investigator Joseph Thomas of the Cook County State's Attorney's Office testified that he interviewed defendant's sister, Iesha, who told him that she picked up defendant at "63rd and Cottage Grove," not "63rd and Eberhart."

¶ 50 ReSean was 19-years-old at the time of trial. He testified that he lived at 447 Pacesetter on July 19, 2013, and around 12:50 a.m. that morning, he was home with his family. ReSean heard arguing outside but did not leave the house at first because he had his son. Anthony, Raheem, and

Jaqwon went outside to see what was happening. ReSean heard "[a]bout 15 to 20 shots," and saw everybody run into the house and go into the pantry. ReSean then went outside "[b]ecause Kiera said that Jaqwon got shot."

¶ 51    While outside, ReSean testified that he saw "Savage, Peanut, and two of his children." They were shooting. Defendant was "behind the car," and ReSean could see his gun. Defendant was also shooting.  ReSean identified photographs of Savage and Peanut, as Short and Fort, and testified that they were standing in the middle of the street shooting towards his house. The bullets were going into the "[t]rees, cars, and the ground." ReSean identified defendant in open court.

¶ 52    The State moved the rap videos into evidence and defense counsel objected outside the presence of the jury on the basis of relevance. The State countered, arguing that the videos were probative of a fact at issue given defendant's testimony on cross-examination. Defense counsel's objection was noted by the trial court and overruled. Portions of the rap videos were admitted into evidence.

¶ 53    The jury deliberated and found defendant guilty of the (1) attempted first-degree by personal discharge of a firearm of Kiera, Raven and Jaqwon, (2) aggravated battery with a firearm as to Jaqwon, and (3) aggravated discharge of a firearm in the direction of Raven. Defendant filed a posttrial motion, which included challenges to the sufficiency of the evidence and the admissibility of the rap videos. The trial court denied the motion.

¶ 54                                    B. Sentencing

¶ 55    On September 8, 2015, the trial court held a sentencing hearing. It merged the aggravated discharge offenses into the attempted murder offenses, and sentenced defendant to a term of 29 years in prison for the attempted first-degree murder of Jaqwon and 26 years in prison for the same offense as committed against Kiera and Raven. After finding that defendant inflicted severe bodily

injury upon Jaqwon (see 730 ILCS 5/5-8-4(d)(1) (West 2014)), the trial court ordered defendant to serve the 29 and 26-year sentences consecutively. Defendant's aggregate sentence was 55 years. Defense counsel moved the trial court to reconsider its sentence. The motion was denied.

¶ 56　Defendant appeals, and argues that (1) the evidence presented at trial was insufficient to convict him of the attempted murder offenses, (2) the trial court abused its discretion when it admitted the rap videos into evidence, (3) his trial counsel was constitutionally ineffective and (4) his convictions violate the one act, one crime doctrine.

¶ 57　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 58　　　　　　　　　　　　C. Sufficiency of the Evidence

¶ 59　The due process clause of the fourteenth amendment to the United States Constitution safeguards an accused from conviction in state court except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged. *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 315-316 (1979)). Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *People v. Brown*, 2013 IL 114196, ¶ 48 (quoting *Jackson*, 443 U.S. 307, 318-319 (1979). The inquiry remains the same whether irrespective of whether the evidence is direct or circumstantial. *People v. Howery*, 178 Ill. 2d 1, 38 (1997).

¶ 60　The reasonable doubt standard of review "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. (quoting *Jackson*, 443 U.S. 307, 319 (1979).

Accordingly, a reviewing court will not retry a defendant on appeal or substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses. *Brown*, 2013 IL 114196, ¶ 48. We will not reverse the trial court's judgment unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 61    Defendant challenges the sufficiency of the evidence on appeal, but predicates his argument on the wording of the jury instructions, claiming they imposed a heightened burden of proof upon the State. Specifically, defendant argues that the issues instructions for attempted first-degree murder, as modified to include the names of Kiera, Raven and Jaqwon, as opposed to "an individual" (see Illinois Pattern Jury Instructions, Criminal, No. 6.07X (approved July 18, 2014)), elevated the State's burden of proof and rendered the burden insurmountable based on the evidence presented at trial.

¶ 62    Defendant's argument fails outright because (1) a reviewing court's limited determination on sufficiency review does not rest on how the jury was instructed (see *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016)) and (2) defendant expressly states in his opening brief that he does not challenge the jury instructions as erroneous ("Boone is *not* complaining the instruction was erroneous"). On review of the sufficiency of the evidence, not even the addition of an extraneous and unnecessary element of proof to jury instructions factors into the analysis. *Musacchio*, 136 S. Ct. at 715 (holding that "when a jury instruction sets forth all the elements of the charged crime but incorrectly adds one more element, a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction"). Accordingly, the instructions at issue here did not impose a heightened burden on

the State or add an unnecessary additional element to the statutory offense of attempted first-degree murder.

¶ 63    To sustain a conviction for attempted first degree murder, the State must prove beyond a reasonable doubt that the defendant (1) performed an act constituting a "substantial step" toward the commission of murder and (2) intended to kill the victim. 720 ILCS 5/8-4(a) (West 2014); *Id.* § 9-1(a); *People v. Vega*, 2018 IL App (1st) 160619, ¶ 41. The specific intent to kill is a necessary element of the offense. *People v. Scott*, 2020 IL App (1st) 180200, ¶ 54. Because a specific intent to kill state of mind is rarely proven by direct evidence, it may be inferred by a jury from circumstantial evidence, including the character of the assault and the use of a deadly weapon. *People v. Coolidge*, 26 Ill. 2d 533, 536-37 (1963) ("it has come to be recognized that an intent to take life may be inferred from the character of the assault, the use of a deadly weapon and other circumstances").

¶ 64    It is well-settled that the requisite mind state necessary to sustain an attempted murder conviction may be "inferred from evidence that defendant voluntarily and willfully committed an act and that the natural tendency of such act was to destroy another's life." *People v. Bailey*, 265 Ill. App. 3d 262, 273 (1994) (citing *People v. Latimer*, 35 Ill. 2d 178, 182-83 (1966)). The "very fact of firing a gun at a person supports the conclusion that the person doing so acted with the intent to kill." *Scott*, 2020 IL App (1st) 180200, ¶ 54 (quoting *People v. Seats*, 68 Ill. App. 3d 889, 895 (1979)).

¶ 65    We hold, when considering the evidence in the light most favorable to the State and drawing all reasonable inferences from the evidence in the State's favor, that a rational trier of fact could have found the essential elements of the attempted first-degree murder offenses (720 ILCS 5/8-4(a), (c)(1)(C) (West 2014); *Id.* § 9-1) beyond a reasonable doubt. The record establishes that

17

defendant, along with his co-defendants, Short and Fort, pointed and repeatedly discharged their guns at victims Kiera, Raven and Jaqwon, each of whom based on eyewitness testimony composed part of a group that was in the line of fire. The testimony of the eyewitnesses to the shootings and the jury's credibility findings in this case are dispositive. *People v. Gray*, 2017 IL 120958, ¶ 36 ("[t]he testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant"); *Brown*, 2013 IL 114196, ¶ 48 (a reviewing court will not substitute its judgment for that of the trier of fact on witness credibility).

¶ 66    Kiera was a close-proximity eyewitness to the events that unfolded in the early morning hours of July 19, 2013. She gave a personal and detailed account of her positioning and the proximity of her and her family members to the shooters at the time the shots were fired. Kiera testified that she was "three feet" away from Short during the argument, defendant stood to the left of Short, "ten feet" away, Raheem was close enough to grab her by the shoulder, Raven was behind her, Kiera's seven-year-old sister Rhea was near her and Raymon, Jaqwon, and Raquan were "close by."

¶ 67    Though, as defendant points out, Kiera testified that she did not see defendant fire his gun, she nevertheless testified to all the critically important events that immediately preceded the gunfire. Kiera testified that during her argument with Short she saw him pull a gun from his waistband and discharge it into the sky. She observed defendant laying on the car "pointing his gun towards me and my family." Kiera saw Fort in the street with a gun pointed at her "siblings." She then heard "15 to 20" gunshots coming from different directions.

¶ 68    Raven was a close-proximity eyewitness to the events on the night in question. Raven testified that she was a "few feet" behind Kiera during the argument with Short. She stated that

Jaqwon and Raheem were standing next to Kiera and the rest of her family members, which included Rhea, Raquan and Raymon, were "back behind" her.

¶ 69 Raven saw Short when he "pulled out a gun and shot it in the air." She identified Short's gun as "black with a long clip." Raven further observed defendant for "a couple of seconds" as he leaned over the car and pointed his gun at "all of us": Kiera, Raheem, Jaqwon, Anthony, Rhea and Raquan. Raven indicated that Fort, whom she observed standing in the street, "had a gun too" and he pointed it pointed in the same direction. Raven then heard "ten to fifteen" gunshots.

¶ 70 Jaqwon, who was 14-years-old on July 19, 2013, personally witnessed the events and bore the brunt of defendant and his co-defendant's criminal acts when a bullet entered his back and exited his torso. Jaqwon testified that he saw Short arguing with Kiera and heard him say "we got bangers." Short then grabbed a gun, pointed to the sky and Jaqwon heard shots. He and his cousins, Raheem, Raven, Kiera, and Raymon, ran together towards his house. Jaqwon bumped Kiera while running and "felt some blood." Jaqwon was shot in the back. Jaqwon was transported to a children's hospital.

¶ 71 Raquan, who was 12-years-old on July 19, 2013, witnessed the shootings and saw defendant and Fort fire their guns at him and his family members. Raquan testified that he recognized defendant, Short and Fort as "Watts," "Savage" and "Peanut." Raquan saw Fort reach into his pants for a gun. Fort was in the street "firing a gun towards us." Raquan knew the gun was firing "[b]ecause I saw the little light, and then I saw fire come out." Fort's gun was pointed "towards the family." Raquan saw defendant leaning over the car with his right arm extended and "firing a gun at us." He knew defendant was firing a gun because he "saw the little light and fire come out." Altogether, Raquan heard 15 to 20 gunshots.

¶ 72    ReSean corroborated parts of the testimony of Kiera, Raven, and Raquan, and provided his own eyewitness account of the shootings for the jury. ReSean testified that he heard "[a]bout 15 to 20 shots," exited the house at 447 Pacesetter and saw defendant, Short and Fort shooting. Defendant was shooting from "behind the car," and ReSean testified that he could see his gun.

¶ 73    Viewed together, the eyewitness testimony of Kiera, Raven, Jaqwon, Raquan, and ReSean, intimately conveyed the positioning of the victims in relation to the shooters, the direction in which defendant, Short and Fort's pointed their guns, the fact of discharge, and the number of times the guns were fired. Based on this evidence, a rational trier of fact could have found that defendant took a substantial step towards the commission of murder by repeatedly firing his gun and specifically intended to the victims. 720 ILCS 5/8-4(a) (West 2014); *Id*. § 9-1(a); *People v. Vega*, 2018 IL App (1st) 160619, ¶ 41.

¶ 74    The law in Illinois is clear that the positive and credible testimony of an eyewitness is sufficient to convict (*Gray*, 2017 IL 120958, ¶ 36), circumstantial evidence may be used to prove the specific intent to kill (*Coolidge*, 26 Ill. 2d 533, 536-37 (1963)) and the very fact of firing a gun at a person supports the conclusion that the person doing so acted with the intent to kill (*Scott*, 2020 IL App (1st) 180200, ¶ 54). All these ingredients are present in the instant record and they combine to establish guilt beyond a reasonable doubt.

¶ 75    The fact that victims Kiera and Raven were not hit with bullets does not support the inference that defendant or his cohorts lacked the specific intent to kill. See *People v. Scott*, 271 Ill. App. 3d 307, 311 (1994) ("when a gun is used, even if a defendant fires shots in the general direction of the victim, but those shots do not hit the victim, we permit an inference of intent to kill"). We also reject defendant's contention that this case in an outlier. To the contrary, it is in line with precedent. See *People v. Garcia*, 407 Ill. App. 3d 195, 201-02 (2011) (a fact finder could

reasonably infer an intent to kill "from the act of firing two bullets in the direction of an occupied car and a crowded street"); see also *People v. Green*, 339 Ill. App. 3d 443, 451-52 (2003) (a jury could reasonably infer an intent to kill from evidence that the defendant fired a pistol four to five times in the direction of officers seated in a vehicle, even though defendant missed them at close range); *Bailey*, 265 Ill. App. 3d 262, 273 (1994) (the defendant's "conduct in shooting down a breezeway in which several people were running is sufficient evidence to prove a specific intent to kill"). In conclusion, the evidence in the record is not so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. Reversal is not warranted.

¶ 76                        D. Hypothesis of Innocence

¶ 77    Defendant next argues that his conviction for the attempted first-degree murder of Jaqwon must be reversed because the state failed to support its accountability theory with proof beyond a reasonable doubt. Defendant claims the evidence established that a "unidentified fourth shooter," who wielded a shotgun and could have hit Jaqwon with a shotgun pellet, and the State failed to "disprove" that he "was among the group of individuals with whom the defendant shared a common criminal design." (citing *People v. Ivy*, 2015 IL App (1st) 130045, ¶ 41). In other words, the State had to tie the actions of defendant, Short, and Fort to this unknown shooter before he could be held accountable for having shot Jaqwon. The jury heard evidence of this hypothesis of innocence and rejected it. *People v. Weeks*, 2012 IL App (1st) 102613, ¶ 32 ("[t]he trier of fact is not required to *** search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt"). Defendant's argument fails.

¶ 78                        E. Admissibility of the Rap Videos

¶ 79    Defendant next challenges the trial court's decision to admit portions of the rap videos into evidence based on defendant's testimony given on cross-examination. Defendant argues that the

portions of the videos played by the State for the jury were "not relevant," claiming "the fact of consequence was whether Boone shared criminal or common design with Fort and Short" and "[a]ppearing in rap music videos with [Short and Fort] does not make that fact more or less probable."

¶ 80    Defendant further argues that the rap videos were more prejudicial than probative because: (1) the "Subliminal" video shows defendant using "vulgar language" and the lyrics of the "Tuenchi be da man" implies that "defendant is a drug dealer; (2) both videos show defendant "and other rappers flashing gang signs"; and (3) the videos "imply [defendant] is likely to shoot someone with Short and Fort." Defendant contends that the "imagery" of defendant pretending to point a gun, and Fort actually pointing a gun, were "in no way related to the crime charged."

¶ 81    It is well established that trial courts possess discretion in determining the admissibility of evidence, and a reviewing court may overturn a trial court's decision only when the record clearly demonstrates the court abused its discretion. *People v. Harris*, 231 Ill.2d 582, 588 (2008). Similarly, the latitude to be allowed on cross-examination and rebuttal is a matter within the sound discretion of the trial court, and a reviewing court should not interfere unless there has been a clear abuse of discretion. *Id*. An abuse of discretion occurs where no reasonable person would agree with the position adopted by the trial court. *People v. Farris*, 2012 IL App (3d) 100199, ¶ 26.

¶ 82    Evidence is generally admissible if it is relevant. Ill. R. Evid. 402 (eff. Jan. 1, 2011). "Relevant evidence" is defined as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ill. R. Evid. 401 (eff. Jan. 1, 2011). Even relevant evidence, however, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 83    We have reviewed the record and find that defendant has failed demonstrate an abuse of discretion on the part on the trial court. The fact of the matter is that defendant opened the door to the admission of his rap videos which, absent his testimony on cross-examination, may not have been admissible. *Harris*, 231 Ill. 2d 582, 588 (2008) ("[t]here is no question that a defendant can open the door to the admission of evidence that, under ordinary circumstances, would be inadmissible"). Defendant took the stand and denied that he knew Short as "Savage." He further denied referring to Short as "Savage" in his rap videos. When asked, defendant denied that he was good or close friends with Short and "was not sure" whether Short was holding a gun in one of his videos. Defendant could not recall whether Fort had appeared in a rap video with him and testified that he was never with Short and Fort together.

¶ 84    Based on this testimony, the trial court allowed the State to present video clips of defendant's rap videos for the purpose of impeaching several statements he made to the jury. The videos did just that, they depicted defendant with Short and Fort, showed Short holding a gun, defendant referred to Short as "Savage" and overall, the videos provided a clear picture of defendant's relationship with Short and Fort, which he attempted to minimize on cross-examination. Simply put, defendant opened the door and the trial court was justified in allowing the State to present evidence that impeached his various statements. The portions of the rap videos played of the jury were clearly relevant in light of defendant's testimony.

¶ 85    Defendant' challenges to the portions of the rap videos as more prejudicial than probative also must fail. The rap video lyrics were not transcribed and in light of the evidence the jury heard, we reject the notion that vulgarity carried a prejudicial impact. The hand gestures of defendant and the many individuals depicted in the portions of the rap video played for the jury were not translated by an expert for the jury, no questions were asked about them, and there is no indication

23

whatsoever that the jury could have understood the gestures as communicating gang membership. Defendant's claims of prejudice are speculative and unavailing.

¶ 86    As for the depiction of a gun, defendant denied that Short had a gun in his rap videos, and the evidence indicated the contrary. We reject outright defendant's claim that the video clip imagery was "in no way related to the crime charged." To the contrary, defendant was on trial for shooting, in tandem with Short and Fort, into a group of young individuals on July 19, 2013. The State advanced both personal and accountability theories of liability to the jury and defendant's association and friendship with co-defendants Short and Fort was very much at issue based on the evidence. Defendant has failed to demonstrate that the trial court's admission of the rap video clips into evidence was an abuse of discretion.

¶ 87    But if trial court had not admitted the portions of the rap video into evidence, the result would have remained the same. *In re E.H.*, 377 Ill. App. 3d 406, 415 (2007) ("an evidentiary error is harmless where there is no reasonable probability that the jury would have acquitted the defendant absent the error). The positive and credible eyewitness testimony of Kiera, Raven, Jaqwon, Raquan and ReSean, which we discussed at length above, conclusively demonstrated beyond a reasonable doubt that defendant discharged his gun in tandem with Short and Fort multiple times at the victims with the specific intent to kill. The jury considered all the evidence, rejected the hypotheses of innocence, and was unpersuaded by defendant's alibi defense. The eyewitnesses recognized defendant, Short and Fort as the shooters by their faces, their presence in the neighborhood or their nicknames, and then identified defendant, Fort, and Short in photo arrays, physical lineups and in open court. The eyewitnesses established their physical positioning and their location relative to shooters at the time the shots rang out and testified in detail about how defendant, Short and Fort pointed their guns and discharged them into their group. If the

portions of his rap videos were not played for the jury or admitted into evidence at trial, there still would have been no reasonable probability that defendant would have been acquitted.

¶ 88                                    F. Ineffective Assistance of Counsel

¶ 89    Defendant argues that his trial counsel was constitutionally ineffective such that his convictions must be reversed. Defendant claims his trial counsel "failed to seek discovery" and had he done so, defendant may not have taken the stand, placed the fact of his physical presence with his co-defendants at issue, and the rap videos would never have been played for the jury. He also complains trial counsel should have asked the trial court to give the jury a limiting instruction regarding the purpose for which the portions of the rap videos were being played.

¶ 90    Claims of ineffective assistance are governed by the standard set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). See *People v. Albanese,* 104 Ill.2d 504, 526 (1984) (adopting *Strickland*). To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *People v. Cathey*, 2012 IL 111746, ¶ 23 (citing *Strickland,* 466 U.S. at 687). More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. (citing *Strickland,* 466 U.S. at 694).

¶ 91    A defendant's failure to establish either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *People v. Henderson*, 2013 IL 114040, ¶ 11. Because both elements of *Strickland* are essential, a court may proceed directly to the question of prejudice, without considering whether defense counsel's performance fell below professional standards, as alleged. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

prejudice, which we expect will often be so, that course should be followed." *People v. Gray*, 2012 IL App (4th) 110455, ¶ 48 (quoting *Strickland,* 466 U.S. at 697).

¶ 92    Even if defendant had demonstrated a legal obligation on the part of the State to disclose the rap videos through pretrial discovery, which he has not, defendant's claims of ineffective assistance of counsel would nevertheless fail because he cannot establish prejudice based on this record. There is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. We have reviewed the eyewitness testimony at length and need not recount the evidence here. The State's case was strong and the eyewitness testimony carried the day.

¶ 93                                   G. One Act, One Crime Doctrine

¶ 94    Defendant contends that his "conviction for aggravated battery with a firearm of Jaqwon and attempted murder of Jaqwon are carved from the same physical act" and therefore, run afoul of the one act, one crime doctrine first articulated in *People v. King,* 66 Ill.2d 551, 566 (1977) (holding that multiple convictions are improper where only one physical act was manifested or multiple acts were manifested, but some of the convictions are for included offenses). But we need not conduct a one act, one crime doctrine analysis. The record in this case shows that the trial court merged that aggravated battery offense into the attempted first-degree murder offense such that there is no conviction to vacate. Accordingly, defendant's argument fails.

¶ 95    Defendant asks us to vacate his conviction for aggravated discharge of a firearm to Kiera. However, the record indicates that no such conviction was entered. Finally, asks us to correct the mittimus. Defendant complains that he was "sentenced on counts 4, 9, 14, 36, 42 and 43, but the mittimus refers to counts 3, 6, 9, 22, 28 and 29." We have reviewed the mittimus, which reflects

three convictions for attempted first-degree murder entered on counts 3, 6 and 9. No correction to the mittimus is necessary.

¶ 96                          CONCLUSION

¶ 97    Accordingly, we affirm the judgment of the Circuit Court of Cook County.

¶ 98    Affirmed.