2023 IL App (1st) 220433-U

No. 1-22-0433

Second Division
June 20, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | No. 14 CR 10366 (02) |
| v. | ) | |
| | ) | Honorable |
| WATTS BOONE, | ) | Geraldine D'Souza, |
| | ) | Judge, Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE COBBS delivered the judgment of the court.
Justices Howse and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's summary dismissal of defendant's initial postconviction petition is affirmed where his claim of ineffective assistance of appellate counsel was forfeited and he was not prejudiced by retained postconviction counsel's unreasonable assistance.

¶ 2    Following a jury trial, defendant-appellant Watts Boone was found guilty of attempted first degree murder, aggravated battery with a firearm, and aggravated discharge of a firearm. He was sentenced to a total of 55 years' imprisonment. This court affirmed his convictions on direct

appeal. *People v. Boone*, 2020 IL App (1st) 152862-U. On December 22, 2021, defendant, through privately retained counsel, filed an initial postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)), alleging actual innocence and ineffective assistance of trial and appellate counsel. The trial court summarily dismissed defendant's petition. Defendant now appeals from that dismissal, arguing that he set forth an arguable claim of ineffective assistance of trial and appellate counsel. In the alternative, he argues that his postconviction counsel provided unreasonable assistance. For the reasons that follow, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4      Based on a shooting that occurred on July 18, 2013, in Riverdale, Illinois, defendant and codefendants, Antwon Short and Antonio Fort, were arrested and charged with a number of criminal offenses. Specifically, defendant was charged with attempted first degree murder by personal discharge of a firearm (720 ILCS 5/8-4(a), (c)(1)(C) (West 2014)) as to Jaqwon Jones, Kiera Jones, Raven Willis, Raheem Wilkins, Anthony Jones, Raymon Fuller, and Raquan Miles; aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2014)) "in the direction of" Kiera, Raven, Raheem, Anthony, Raymon, and Raquan; and, aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2014)) as to Jaqwon. The matter proceeded to a jury trial on June 9, 2015. Defendant was tried separately from his codefendants and was represented by private counsel, Dennis Sherman.[1]

¶ 5                                       A. Trial

¶ 6                               1. The State's Case-in-Chief

_____

[1] We take judicial notice that, as of 2017, Sherman is prohibited from the practice law due to voluntary disbarment. See *In re Dennis Hugh Sherman*, 2016 PR 00100.

¶ 7    The State proceeded to trial on three counts of attempted first degree murder, one count of aggravated battery, and two counts of aggravated discharge of a firearm. We recount the eyewitness testimony in particular detail as it is that testimony which forms the basis of defendant's claims here on appeal.

¶ 8    On July 19, 2013, Kiera Jones, aged 21 at the time, was at her god-mother's home located at 447 Pacesetter Parkway in Riverdale. The family had recently moved to the neighborhood. That night, the individuals at the home were Raven Willis and Rhea Willis, Kiera's god-sisters; Raymon Fuller, her brother; Raheem Wilkins and Jaqwon Jones, her cousins; Raquan Miles her god-brother; and Anthony Jones, a friend-of-the-family.

¶ 9    Around 12:30 a.m., Kiera and then 22-year-old Raven, left the home to walk to a nearby gas station at 137th Street and Halsted Street to buy snacks. On their way, they walked past defendant, Short, and Fort, who were standing "to the side of the street" with three women near 465 Pacesetter. Short told Kiera that she needed to "take [her] bun out of [her] hair." Kiera described Short, as "a tall, light-skinned guy with a [fauxhawk]" and Raven described him as "tall, caramel, tan with a [fauxhawk]." Neither Keira nor Raven had seen Short before. Kiera identified Fort, who she described as having "dreads." Raven testified that she had seen Fort around the neighborhood but she did not know him. Both Raven and Kiera identified defendant as the third man and testified that that was the first time they had ever seen him. When they arrived at the store, Raven called her brother, Anthony, who was at the house and asked him about "the boys down the street."

¶ 10    As Kiera and Raven were walking back from the store, defendant, Short, and Fort were still outside near 465 Pacesetter. Short said something else to Kiera about her leggings. When Kiera turned around, she realized Short was following her and was only three feet away. At this

time, she saw defendant leaning on a car and Fort standing nearby. She said to Short, "dude, what's your f*** point?" and they started arguing. Kiera testified that defendant was about ten feet behind Short and she had a "full view" of defendant. At that point, Kiera did not see any weapons in any of the three men's hands. Raven was standing behind Kiera, and she had "an opportunity to see" all three men's faces. The argument lasted three to five minutes, during which Fort began to move into the street.

¶ 11    During Kiera's argument with Short, Raheem, Jaqwon, Raymon, Raquan and Anthony came outside of the house because they heard arguing. Raheem tried to pull Kiera away from the altercation but she "swatted him away." Jaqwon and Raheem were standing near Kiera and the rest of the family was behind Raven. Jaqwon, like Raven and Kiera, described Short as having a "mohawk." According to Kiera, Raven, and Jaqwon, Short then stated that he had "big bangers" and he pulled a gun out from his waistband and shot it into the air. Kiera testified that she understood "bangers" to mean guns, as did Jaqwon. Raquan, who was 12 years old at the time, testified that he saw Short fire into the air and then point the gun towards his family. Raquan observed Fort "reaching in like his pants for a gun." Kiera saw Fort was in the street, pointing a gun at her family. According to Kiera and Raven, defendant was laying down on a car at this point with his arm extended, pointing a gun at Kiera and her family.

¶ 12    Raquan testified that he recognized Short as "Savage," who he had seen previously "before the 4th of July." Raquan identified Fort as "Peanut," and he testified that he had not seen him before. He later stated on cross-examination that he recognized "Peanut" from the neighborhood as they had friends in common and he had "seen" him before but he had "never met him." Raquan identified defendant as "Watts." He initially testified that he had never seen defendant before that day, but his written statement to the police on September 13, 2013, stated that he had seen

defendant "about two times before that day and he had talked to [defendant] for a few minutes on the 4th of July." He later explained that he was familiar with defendant from visiting a girl's house, whose older brothers were "some of the dudes" that defendant "hung out with."

¶ 13    When Kiera saw that defendant and Fort also had guns, she ran away. Jaqwon testified that he ran away towards the house as soon as he heard the first shot fired into the air, and then he heard several more shots. Kiera testified that she did not see defendant fire the gun but she heard about 15 to 20 gunshots in total. Raven testified that she heard 10 to 15 gunshots but could not tell from where they were coming. Raquan saw Fort and defendant firing guns at his family, and he testified that he knew that because he "saw the little light and fire come out." He testified that he heard 15 to 20 gunshots. Kiera helped her sister, Rhea, into the house because "she was just standing there." As Jaqwon was running into the house, he bumped into Kiera. He felt blood on his right side and realized he had been shot. Once inside the house, Kiera heard Jaqwon say that he had been shot. At 12:55 a.m., an ambulance arrived and Jaqwon was transported to MetroSouth Hospital, about four miles away from the house. Jaqwon had a gunshot wound to the right side of his chest. Kiera testified that the streetlight on that block was working that evening and there was enough light to read a book. Jaqwon testified that it was dark outside.

¶ 14    Based on the initial interviews with the witnesses and the street names or nicknames given for the shooters, detectives from the Riverdale Police Department were able to produce photo arrays of suspects. The nicknames provided were "Toochie" for defendant, "Savage" for Short, and "Peanut" for Fort. On the afternoon following the shooting, Kiera and Raven met with detectives and separately viewed photo arrays. They both identified defendant, Short, and Fort from separate arrays. On July 22, 2013, the police showed Raquan photo arrays, from which he identified Short ("the one that shot in the air and shot at my family"), Fort ("the person holding

the gun" who "shot at my family"), and defendant ("the person who shot at my family"). On July 27, 2013, Kiera, Raven, and Raquan separately viewed physical lineups, from which they each identified Short, although they both noted that his hairstyle had changed. On September 12, 2013, they separately viewed another lineup and identified defendant, the individual who was leaning on the car and pointing a gun at the group. On May 30, 2014, Kiera viewed another lineup and identified Fort, the individual standing in the street pointing a gun at her siblings.

¶ 15    Riverdale police officer Jeff Michalek, an evidence technician, testified that he went to 447 Pacesetter on July 19, 2013, around 12:50 a.m. Nearby 463 and 465 Pacesetter, he recovered five 40-caliber shell casings that would have come from a semi-automatic handgun. He also observed that a red Pontiac Sunfire had a bullet hole in the right passenger side door. Michalek explained that "[u]sually shell casings that are left behind are from semi-automatic weapons" because "the spent shell is ejected[,]" but when a revolver is fired, "the casing stays in the cylinder." He testified that there were streetlights on in the area, and that "[y]ou probably could have read a book" in that lighting. Finally, he testified that he did not find any evidence of blood at the scene, other than in the upstairs bedroom where Jaqwon was located after he had been shot.

¶ 16    Defendant filed a motion for a directed finding, which the trial court denied.

¶ 17                                2. Defense's Case

¶ 18    Lieutenant Michael Murzyn was a sergeant working for the Chicago Police Department on July 19, 2013. He testified that around 1:40 a.m. on that day, he went to Trinity Hospital to respond to a report of a person shot. In the emergency room, he met with defendant and his sister. An incident report was filed, identifying defendant as the victim of an aggravated battery with a firearm. Based on the address at which defendant stated the shooting occurred, Murzyn directed

law enforcement to "63rd and Eberhart." Nothing was found at the location to corroborate defendant's report.

¶ 19    Iesha Robinson, defendant's sister, testified that in the early hours of July 19, 2013, she was at her grandmother's house at 5716 South Michigan Avenue when she received a phone call from defendant. He told her to pick him up from 63rd and Eberhart. When she arrived at the location, defendant was "holding his leg [and] saying he was shot[,]" but he did not know who shot him. Iesha did not see any blood but drove him to Trinity Hospital, which was about 20 to 30 minutes away. She testified that she did not go to a closer hospital because she was "scared" and she was "just trying to get out [of] the area." Finally, she testified that she did not recall speaking to a police officer at the hospital and did not recall her route to the hospital.

¶ 20    Defendant testified that "he was presently on felony probation." On the night of July 18, 2023, he was with some friends when his friend, Terrell, found out about a party, which was near 63rd and Eberhart. They went to the party and stayed for about two hours. He testified that, around midnight of July 19, 2013, an "incident" occurred at the party where some individuals started arguing and everyone was forced to leave the party. When he walked outside, he heard eight or nine gunshots and ran away. He stopped because he "couldn't move" and "everything got numb." He testified that he was shot in the back of his knee. He called his sister because it was the first number he saw on his phone. She arrived about 10 to 15 minutes later and took him to Trinity Hospital. According to hospital records, defendant arrived there at 1:31 a.m. He testified that he was not in Riverdale that night, did not shoot anyone, and did not know the State's witnesses.

¶ 21    On cross-examination, defendant acknowledged that he was friends with the codefendants. He knew Short as "Coco" and Fort as "Grandson." He denied knowing Short by the nickname

"Savage." He acknowledged that his nickname was "Tuenchi, which he pronounced "Tucci,"[2] and that he would sometimes "hang out" in Riverdale, also known as "Speedyville," which includes the area where this shooting occurred. He admitted that he made rap music videos, posted them on YouTube, and used the name "Tuenchi" in in the videos. He stated that he was "not sure" if Short was in a music video of his holding a gun and he could not recall whether Fort was featured in his music videos.

¶ 22    The State showed portions of two of defendant's music videos, "Subliminal" and "Tunechi Be Da Man," which were made in 2012. The videos show both Short and Fort in the background. Defendant testified that when he said "savage" in the video, he was referring to himself, not Short's nickname. Short appears in one video with a gun in his hand.

¶ 23                                3. The State's Rebuttal

¶ 24    Murzyn testified that Trinity was six miles away from 63rd and Eberhart, and there were closer hospitals to that area, including the University of Chicago Hospital, St. Bernard's Hospital, Jackson Park Hospital, and South Shore Hospital. Murzyn testified that no evidence of a shooting was found at 63rd and Eberhart and there were no reports of shots fired in that area that night.

¶ 25    Chicago police sergeant Willie Darkried testified that, when defendant was arrested on September 11, 2013, he gave his address as 13659 South Lowe Avenue in Riverdale.

¶ 26    RaeSean testified that he lived at 447 Pacesetter on July 19, 2013. That night, around 12:50 a.m., he heard arguing outside. He saw Jaqwon, Raheem, and Anthony head outside the house but he stayed inside with his son. Soon after, he heard about 10 to 15 gunshots and everyone ran back

_____

[2] Defendant's nickname was spelled in court as "Tuenchi." Throughout the record, it is also spelled "Tucci," "Toochie," and "Tunechi." We will use "Tuenchi" in this order as it is used the most frequently.

inside the house. Because Kiera told him that Jaqwon had been shot, RaeSean went outside and saw "Savage," "Peanut," "Toochie" shooting. He testified that defendant was "behind the car" and he could see defendant had a gun. Peanut and Savage were standing in the middle of the street, shooting towards his house and "at trees, cars, and the ground." That afternoon, he identified defendant, Short, and Fort from separate photo arrays. On July 27, 2013, he identified Short from a physical lineup. On September 12, 2013, he identified defendant from a physical lineup. On cross-examination, RaeSean testified that he was outside for about 90 seconds and saw defendant about "two or three houses down."

¶ 27                              4. Closing Arguments and Verdict

¶ 28     As relevant to the issues on appeal, in his closing argument, defense counsel specifically attacked the reliability of the eyewitnesses' identifications of defendant. Counsel questioned whether there was sufficient light to see faces, whether the eyewitnesses were close enough to see faces, whether an eyewitness would be watching the gun or the faces of the perpetrators, and whether an identification can be accurate when a person is frightened.

¶ 29     The jury found defendant guilty of attempted murder by personal discharge of a firearm as to Jaqwon, Kiera, and Raven; aggravated battery with a firearm as to Jaqwon; and, aggravated discharge of a firearm in the direction of Raven.

¶ 30                              5. Post-Trial Proceedings

¶ 31     Defendant filed a motion for a new trial, challenging the sufficiency of the evidence and the admission of portions of defendant's rap music videos. The trial court denied the motion.

¶ 32     Following the sentencing hearing, the trial court sentenced defendant on three counts of first degree attempted murder by personal discharge of a firearm. The remaining counts merged into those three. The trial court sentenced defendant to 29 years as to Jaqwon, to be served

consecutively to two concurrent sentences of 26 years as to Kiera and Raven, for a total of 55 years' imprisonment.

¶ 33    On direct appeal, defendant argued that the evidence was insufficient, the trial court abused its discretion when it admitted defendant's rap music videos into evidence, trial counsel was ineffective for failing to ask for defendant's rap videos in discovery, and his convictions violated the one-act, one-crime doctrine. On November 13, 2020, this court affirmed the judgment of the trial court but corrected defendant's mittimus. *People v. Boone*, 2020 IL App (1st) 152862-U. The Illinois Supreme Court denied defendant's petition for leave to appeal on March 24, 2021. *People v. Boone*, No. 126731.

¶ 34    On December 22, 2021, defendant, through privately retained counsel, filed a postconviction petition that is the subject of this appeal. The petition contains essentially two claims: (1) newly discovered evidence in the form of expert testimony on the reliability of eyewitness identifications establishes defendant's actual innocence and (2) defendant was denied effective assistance of counsel where trial counsel failed to impeach Raquan and instead elicited testimony harmful to defendant. No documents or affidavits were attached to his petition, but a footnote stated that defendant did not have the funds to hire an eyewitness identification expert to support his petition.

¶ 35    Specifically, as to his claim of actual innocence, defendant argues that the identifications of defendant were inherently unreliable and an expert's testimony on memory and perception would have been "crucial" to his defense. He submits to the court that this expert testimony was not admissible until 2016 when our supreme court issued *People v. Lerma*, 2016 IL 118496. As relevant here, at the conclusion of this argument, defendant states: "To the extent this Court finds that the defense could have attempted to present an expert on memory and perception at trial,

Lewis argues that his trial counsel was ineffective for not doing so[,]" and cites to *People v. Hayes*, 2021 IL App (1st) 190881-B.[3]

¶ 36    As to his claim of ineffective assistance of trial counsel, defendant contends that trial counsel failed to impeach Raquan with the description of the offender he gave to the police at the scene of the shooting and, instead, elicited testimony "that would lead the jury to believe that Raquan's identification was more reliable than it really was." According to defendant, trial counsel, through his cross-examination of Raquan, clarified that Raquan had actually seen and talked to defendant prior to that night, contrary to his testimony on direct examination, and this solidified Raquan's identification of defendant, rather than negating its reliability. He claims this was prejudicial to him because "Raquan was the only person to mention [defendant's] name at the scene" and Raquan's testimony played a "critical role" in convicting defendant.

¶ 37    Finally, defendant admits that this claim could have been raised on direct appeal and therefore he asserts ineffective assistance of appellate counsel as well. The final paragraph in the petition reads: "Boone was denied effective assistance of trial and appellate counsel. As such, he established the gist of a constitutional violation."

¶ 38    On January 28, 2022, the trial court summarily dismissed defendant's postconviction petition.

¶ 39    This appeal followed.

¶ 40                                II. ANALYSIS

¶ 41    On appeal, defendant claims that his postconviction petition should not have been summarily dismissed because it raises an arguable claim that appellate counsel was ineffective for

---

[3] It appears that counsel incorrectly identified defendant as "Lewis" as opposed to "Boone."

failing to raise a claim that trial counsel provided ineffective assistance by "not presenting expert testimony on the flaws of eyewitness testimony that were relevant to his case." Defendant contends that, because his convictions hinged exclusively on the accuracy of the eyewitnesses' identification of him, it is at least arguable that his trial counsel performed unreasonably. To that end, he explains the factors affecting the reliability of eyewitnesses' identifications and how an expert could have shed light on those factors, namely weapon focus, stress, "mugshot commitment," and difficulty in identifying strangers.

¶ 42   Here on appeal, defendant does not pursue his ineffective assistance claim as it relates to trial counsel's failure to impeach Raquan. However, he expressly repudiates the actual innocence claim as it relates to the availability of expert eyewitness. In his argument here, defendant acknowledges that the unavailability of *Lerma* at the time of defendant's trial could not support an actual innocence claim. See *People v. Edwards*, 2012 IL 111711, ¶ 32 (The evidence supporting an actual innocence claim "must be newly discovered, material and not merely cumulative, and of such conclusive character that it would probably change the result on retrial."). He urges that should the improperly framed actual innocence claim result in forfeiture of the expert witness claim that we find the assistance of postconviction counsel not to have been reasonable and to remand this cause for second stage proceedings.

¶ 43                           A. Standard of Review

¶ 44   The Act provides a three-stage procedural mechanism through which a criminal defendant may assert that his conviction was the product of a substantial denial of his constitutional rights. *People v. Davis*, 2014 IL 115595, ¶ 13. At this first stage, the court must initially determine if the petition "alleges sufficient facts to state the gist of a constitutional claim." *People v. Allen*, 2015 IL 113135, ¶ 24. The allegations must be taken as true, if not positively rebutted by the record, and

liberally construed at the first stage. *Id.* ¶ 25; *People v. Domagala*, 2013 IL 113688, ¶ 35. A petition is frivolous or patently without merit only when it "has no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d at 11-12. A petition lacks an arguable basis when it is based on an indisputably meritless legal theory, such as one that is contradicted by the record. *Id.* at 16. Additionally, because a postconviction petition is a collateral attack on the judgment, issues that were raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised on direct appeal, but were not, are forfeited. *People v. Taliani*, 2021 IL 125891, ¶ 53.

¶ 45    We review the summary dismissal of a postconviction petition *de novo*. *People v. Henderson*, 2011 IL App (1st) 090923, ¶ 19.

¶ 46                                    B. Forfeiture

¶ 47    The State makes two arguments that defendant's ineffective assistance claim on appeal has been forfeited. First, the State contends that defendant's claim is forfeited because he did not attach an affidavit or any other documentation from an expert witness demonstrating the testimony counsel should have introduced at trial. According to the State, because defendant failed to provide evidentiary support for his claim and failed to explain its absence, the circuit court properly dismissed the petition. Second, the State contends that defendant's claim is forfeited because it could have been raised on direct appeal.

¶ 48    The Act provides that a petition must be supported by "affidavits, records, or other evidence" or explain why such support is not attached. 725 ILCS 5/122-2 (West 2020). This documentation must "identify with reasonable certainty the sources, character, and availability of alleged evidence supporting the petitioner's allegations." *People v. Treadway*, 245 Ill. App. 3d 1023, 1025 (1993). The purpose of this section is "to establish that a petition's allegations are capable of 'objective or independent corroboration." *People v. Delton*, 227 Ill. 2d 247, 254 (2008)

(quoting *People v. Hall*, 217 Ill. 2d 324, 333 (2005)). Failure to comply with section 122-2 justifies summary dismissal of the petition. *People v. Collins*, 202 Ill. 2d 59, 66 (2002).

¶ 49 We note that the parties dispute whether supporting documentation is necessary for a claim that trial counsel should have introduced identification expert testimony. We need not decide that issue as defendant has provided an explanation for its absence.

¶ 50 Contrary to the State's characterization of the petition, defendant explained in his petition that he did not have the funds to acquire the necessary documentation from an identification expert. The State urges this court to reject defendant's explanation because he is represented by private counsel and there is no allegation of indigency in the record. We refuse to do so. We do not find that a defendant's ability to hire private counsel necessarily equates to available funds to hire an expert witness. Moreover, the Act does not condition that the explanation given must be supported by evidence in the record, and we are aware of no authority that sets forth any further requirements for the explanation. As such, we conclude that defendant sufficiently complied with section 122-2 with his explanation as to why he could not provide documentation of an identification expert's potential testimony to support his claim.

¶ 51 We now turn to the State's argument that defendant's claim is forfeited because it could have been raised on direct appeal.

¶ 52 "Issues that were raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised on direct appeal, but were not, are forfeited." *People v. English*, 2013 IL 112890, ¶ 22. An issue could have been raised on direct appeal if the facts giving rise to the claim appear on the face of the record and supplementary documentation was not needed for the reviewing court to consider the claim. See *People v. Newbolds*, 364 Ill. App. 3d 672, 675-76 (2006). However, a defendant is guaranteed the effective assistance of counsel on direct appeal as

of right, and a claim of ineffective assistance of appellate counsel is cognizable under the Act. *People v. Simms*, 192 Ill. 2d 348, 361 (2000). As such, forfeiture is relaxed "where the forfeiture stems from the ineffective assistance of appellate counsel." *English*, 2013 IL 112890, ¶ 22.

¶ 53 Defendant's postconviction petition expressly states claims of actual innocence based on identification expert testimony and ineffective assistance of trial and appellate counsel based on trial counsel's failure to impeach Raquan. The concluding statement in the actual innocence claim fails to actually assert an ineffectiveness claim, but instead puts the onus on this court to find ineffectiveness should we find that trial counsel could have attempted to present expert testimony. Apparent from a reading of the petition is that postconviction counsel perceived the actual innocence claim, unlike the impeachment claim, as not supported by the record. Thus, the impeachment claim asserts ineffectiveness of both trial and appellate counsel. The actual innocence claim, however, urges ineffectiveness against, only trial counsel. We agree with the State that defendant's appellate counsel ineffectiveness claim is forfeited.

¶ 54 In considering the State's forfeiture argument, and after having reviewed the petition however, we are mindful that (1) a "reasonable assistance" of counsel standard is applicable to Illinois postconviction proceedings (see *People v. Cotto*, 2016 IL 119006, ¶ 30), and (2) waiver is a limitation on the parties, not the court (see also *People v. Custer*, 2019 IL 123339, ¶ 19). We would agree that the petition which erroneously frames the expert witness issue in the context of an actual innocence claim raises some question about the level of postconviction counsel's assistance. Clearly, whether trial counsel should have presented expert testimony at trial is a matter that could have been raised on direct appeal. But for postconviction counsel's error, the issue would have been properly framed to raise ineffectiveness claims against both trial and appellate counsel. It is postconviction counsel's shortcoming that results in forfeiture.

¶ 55    A defendant who retains a private attorney at the first stage of postconviction proceedings is entitled to a reasonable level of assistance of counsel. *People v. Johnson*, 2018 IL 122227, ¶ 23. Under Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), not applicable here, postconviction counsel has a duty to amend the *pro se* petition to allege ineffective assistance of appellate counsel to avoid the procedural bar of waiver. *People v. Addison*, 2023 IL 127119, ¶ 27 (stating that "the failure to allege ineffective assistance of appellate counsel when necessary to overcome a forfeiture was a violation of Rule 651(c)"); *People v. Perkins*, 229 Ill. 2d 34, 44 (2007) ("An adequate or proper presentation of a petitioner's substantive claims necessarily includes attempting to overcome procedural bars[.]"). Given our supreme court's holding in *Johnson*, we can perceive no different duty for private counsel retained at the first stage of the proceedings.

¶ 56    Defendant urges that in the event we find assistance of postconviction counsel to have resulted in forfeiture, that we remand this matter for second stage proceedings to permit defendant to amend his petition to include the ineffectiveness claim. That might have been the appropriate course of action had this case involved appointed counsel at the second or third stage of postconviction proceedings. Under those circumstances, counsel's performance is governed by Rule 651(c) as well as the *Suarez* rule, which provides that a finding of unreasonable assistance necessitates remand regardless of whether the claims had merit. *Addison*, 2023 IL 127119, ¶ 33; *People v. Suarez*, 224 Ill. 2d 37, 41-42 (2007).

¶ 57    However, like here, where retained private counsel is involved at the first stage of postconviction proceedings, this court has concluded that, because Rule 651(c) does not apply, "a *Strickland*-like analysis" is the appropriate standard, requiring an "evaluation of prejudice." *People v. Zareski*, 2017 IL App (1st) 150836, ¶¶ 51, 59; see also *Strickland v. Washington*, 466 U.S. 668 (1984). The purpose for the evaluation of prejudice in this instance is to "prevent pointless remands

to trial courts for repeated evaluations of claims that have no chance of success." *Zareski*, 2017 IL App (1st) 150836, ¶ 59. As such, after determining that counsel provided unreasonable assistance by failing to avoid forfeiture of the claim, this court must also determine whether the failure to do so prejudiced defendant. *Id.* ¶ 61.

¶ 58    Our review for prejudice in this instance is particularly appropriate where, but for the contextual error, defendant's assertion regarding the benefits of expert testimony is fairly briefed. A recharacterization of the claim would add no additional substance, and no speculation would be necessary for reviewing the merits of the claim. Nothing would be gained by remand in this instance. In the interest of judicial economy, we proceed to determine whether defendant's forfeited claim of ineffective assistance of appellate counsel would have been meritorious. If the claim has no merit, then defendant "cannot receive postconviction relief on that claim, regardless of whether [postconviction counsel] should have presented it[.]" *Zareski*, 2017 IL App (1st) 150836, ¶ 61.

¶ 59                    C. Ineffective Assistance of Appellate Counsel

¶ 60    Ineffective assistance of counsel claims are governed by the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by Illinois courts in *People v. Albanese*, 104 Ill. 2d 504 (1984). The standard requires that the defendant show that counsel's performance was deficient and the deficient performance prejudiced the defendant. *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010). Under this second prong, the defendant must show that appellate counsel's deficient performance caused prejudice, *i.e.*, there was a reasonable probability that if appellate counsel had raised the claim on direct appeal, the appeal would have been successful. *People v. Golden*, 229 Ill. 2d 277, 283 (2008). "Appellate counsel is not required to raise issues that he reasonably determines are not meritorious." *English*, 2013 IL 112890, ¶ 34.

Ultimately, we must review the underlying claim of ineffective assistance of trial counsel to determine the merits of defendant's postconviction petition. See *People v. Childress*, 191 Ill. 2d 168, 175 (2000) ("Unless the underlying issue is meritorious, [the defendant] suffered no prejudice from counsel's failure to raise it on direct appeal.").

¶ 61    In the context of postconviction proceedings at the first stage, defendant must show that (1) it is arguable that counsel's performance fell below an objective standard of reasonableness and (2) it is arguable that, but for counsel's deficient performance, the outcome would have been different. *People v. Tate*, 2012 IL 112214, ¶ 19. Both prongs must be satisfied for a defendant to prevail on such a claim. *People v. Coleman*, 183 Ill. 2d 366, 397-98 (1998).

¶ 62    In the case before us, we find that defendant is unable to show that counsel's performance was arguably unreasonable, and therefore, his claim fails.

¶ 63    In assessing whether counsel's performance fell below an objective standard of reasonableness, there is a strong presumption that the challenged action or inaction of counsel may have been the product of sound trial strategy. *People v. Dupree*, 2018 IL 122307, ¶ 44. "Decisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with trial counsel." *People v. West*, 187 Ill. 2d 418, 432 (1999). As such, the reviewing court is "highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from [their] perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007). Representation will not be found to be ineffective unless the strategy was so unsound that counsel fails to conduct meaningful adversarial testing of the State's case or so irrational that no reasonably effective counsel under similar circumstances would use that strategy. *People v. Peterson*, 2017 IL 120331, ¶ 88.

¶ 64    Defendant's trial took place in 2015, one year prior to our supreme court's decision in *People v. Lerma*, 2016 IL 118496, which recognized that identification expert testimony had become widely accepted. Prior to *Lerma*, Illinois case law generally precluded expert testimony on the reliability of eyewitness identification. *Lerma*, 2016 IL 118496, ¶ 24; see also *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 38 (noting that identification testimony was "routinely excluded" prior to *Lerma*, "partly due to skepticism expressed by the supreme court"). The supreme court was concerned with "whether and to what degree it can aid the jury, and if it is necessary in light of [the] defendant's ability to cross-examine eyewitnesses." *People v. Enis*, 139 Ill. 2d 264, 289 (1990) (*Enis I*). In 2016, however, our supreme court reversed course, holding that, in appropriate circumstances, expert testimony concerning the reliability of eyewitness identification is both relevant and admissible. *Lerma*, 2016 IL 118946, ¶ 26. Ultimately, in *Lerma*, the supreme court ruled that the trial court abused its discretion in denying the defendant's request to present such expert testimony where the evidence against the defendant consisted solely of two eyewitness identifications, one of which was not subject to cross-examination. *Id.*

¶ 65    Notably, the court in *Lerma* was faced with an entirely different question, *i.e.* whether the trial court abused its discretion in excluding expert testimony. The question before us is whether trial counsel was unreasonable for failing to procure an expert witness on eyewitness identifications. See *Macklin*, 2019 IL App (1st) 161165, ¶ 39. As stated, trial counsel's decisions on which witnesses to call and what evidence to present are matters of trial strategy and are "generally immune from claims of ineffective assistance of counsel." *People v. Reid*, 179 Ill. 2d 297, 310 (1997); see also *People v. Manning*, 241 Ill. 2d 319, 333 (2011) (noting that "counsel's strategic choices are virtually unchallengeable"). Further, there is no *per se* rule that trial counsel's failure to call an expert witness to testify at trial is ineffective assistance, especially where the State

- 19 -

could procure its own witness to contest that testimony. *People v. Hamilton*, 361 Ill. App. 3d 846, 847 (2005).

¶ 66     In the case before us, based on the prevailing case law at the time, trial counsel's failure to procure expert testimony on eyewitness identification did not arguably fall below an objective standard of reasonableness. In the pre-*Lerma* era, our supreme court rejected this same argument in a defendant's postconviction petition in *People v. Enis*, 194 Ill. 2d 361, 393 (2000) (*Enis II*), in which the court held that trial counsel was not ineffective for failing to seek additional expert opinions on the reliability of eyewitness identification. As such, we consider it reasonable for counsel to have considered that any expert witness on the reliability of eyewitness identification would be rejected by the trial court, as was common practice then. See *People v. McGhee*, 2012 IL App (1st) 093404, ¶ 54. To hold otherwise, under the facts before us, would be to unfairly judge trial counsel's decisions based on legal authority that was not available at the time. See *Macklin*, 2019 IL App (1st) 161165, ¶ 38 ("Representation based on the law prevailing at the time of trial is adequate, and counsel is not incompetent for failing to correctly predict that the law will change.").

¶ 67     Moreover, in resolving issues involving trial counsel's performance, reviewing courts must consider the totality of counsel's conduct, not just one strategic decision in a vacuum. *Hamilton*, 361 Ill. App. 3d at 847. Based on our review of the trial record, it cannot be said that counsel's strategy resulted in a failure "to conduct meaningful adversarial testing of the State's case" where counsel thoroughly challenged the identifications of the eyewitnesses through cross-examination. For instance, trial counsel questioned the eyewitnesses on the distance between themselves and the shooters; whether they actually saw the shooters fire any shots; how light it was outside; and how much time they had to observe the shooters. He also challenged the eyewitnesses on how they knew the names of the shooters. As such, counsel's cross-examination comported with the supreme

court's pre-*Lerma* view that effective cross-examination could nullify the need for an expert witness. See *Enis I*, 139 Ill. 2d at 289.

¶ 68    Counsel also called into question the reliability of the identifications during closing arguments. Specifically, counsel argued that the eyewitnesses were telling the same story because they were family members and questioned how they could have seen defendant's face if he was behind a car. He also noted that the eyewitnesses did not provide a specific description of defendant to the police. Additionally, counsel pointed out that people misidentify others every day on the street and "memory is affected by all of our emotions." Finally, counsel challenged the identifications using many of the same factors which defendant claims would have been presented by an expert witness, such as lighting, weapon focus, observation time, and heightened state of emotion. Counsel clearly drew the jury's attention to a number of issues with identification testimony. See *Enis II*, 194 Ill. 2d at 393 (finding defendant could not show prejudice where trial counsel "aggressively explored the question of accuracy and reliability of the witnesses' identification of defendant" and argued that "misidentification is a common occurrence in everyday life"). As such, we conclude that trial counsel's performance was not arguably unreasonable.

¶ 69    Although defendant's failure to show a deficiency in counsel's performance is dispositive, we additionally find that defendant failed to show prejudice. As explained, prior to *Lerma*, it was common practice for trial courts in Illinois to exclude expert testimony on the issue of eyewitness identification. See *People v. McGhee*, 2012 IL App (1st) 093404, ¶ 54. Therefore, even if trial counsel had sought to present such expert testimony at defendant's trial, it is unlikely that the trial court would have allowed that testimony to be admitted, and the outcome of trial would certainly not be different. Moreover, on direct appeal, we found that defendant could not satisfy the

prejudice prong for his ineffective assistance of trial counsel claim because "[t]he State's case was strong and the eyewitness testimony carried the day." *Boone*, 2020 IL App (1st) 152862-U, ¶ 92. Counsel also vigorously cross-examined the eyewitnesses on their identifications and sought to cast doubt on those identifications in closing argument. Additionally, we reject defendant's claim that he had a "solid alibi defense." On direct appeal, we noted that, even if the rap videos had not been admitted, "the result would have remained the same" and "the jury *** rejected the hypotheses of innocence, and was unpersuaded by defendant's alibi defense." *Id.* ¶ 87. Based on this record, we do not find it arguable that the presentation of expert testimony on this issue would have had an impact on the outcome of the proceedings. For these reasons, we conclude that defendant was not prejudiced by trial counsel's failure to procure an identification expert witness.

¶ 70    Nonetheless, defendant urges that this court adopt the position taken in *People v. Hayes*, 2021 IL App (1st) 190881-B. In *Hayes*, the defendant was convicted of first degree murder based on the testimony of six eyewitnesses to the murder. *Id.* ¶ 1. In the defendant's initial postconviction petition, he argued that trial counsel was ineffective for failing to call an expert in eyewitness identifications. *Id.* ¶ 22. As in the case before us, the defendant's trial took place prior to *Lerma*. *Id.* ¶ 34. In addressing whether counsel's performance was deficient, the *Hayes* court distinguished its facts from *Macklin*, wherein this court held that counsel's failure to call an expert witness in identifications was not unreasonable as the trial was held prior to *Lerma*. *Id.*; *Macklin*, 2019 IL App (1st) 161165, ¶¶ 38-39. The *Hayes* court pointed out that the defendant had specifically alleged that "counsel knew about the law and science surrounding expert identification testimony" and the State in *Hayes* conceded that there was ample authority to support an argument for admission of expert testimony on identifications. *Id.* The court thus concluded that "counsel should have investigated and sought admission of an expert witness on eyewitness identification given

the facts." *Id.* ¶ 37. Such specific allegations are simply not present in defendant's petition here or in his arguments on appeal.

¶ 71     *Lerma* aside, the facts in *Hayes* are distinguishable, particularly with respect to the length of time each of the six eyewitnesses was able to observe the offender as well as their individual vantage points for doing so. *Id.* ¶ 7. As recited in *Hayes*, one eyewitness saw the offender for less than one minute and looked directly at him for one or two seconds. *Id.* A second saw the offender from inside her apartment at a distance of five feet and got a look at his profile for about five seconds. A third saw the offender from his apartment and got a look at him for less than a second. The fourth saw the offender from her fourth story window and viewed the offender for about 30 seconds. The fifth, who was in his apartment got a "full frontal view of the offender's face for four or five seconds. Finally, the sixth saw the offender from her car, and never saw his face from the front, but from the side for three seconds. *Id.*

¶ 72     The court in *Hayes* relied on these specific "weaknesses in the eyewitness testimony" in finding it arguable that counsel should have sought expert witness testimony on identifications. *Id.* ¶ 50. Distance from the offender and the time each eyewitness observed him is starkly different from the testimony of the eyewitnesses' face-to-face encounter with defendant here. As such, we find *Hayes* inapposite.

¶ 73     Our case is more closely aligned with *People v. Burke*, 2021 IL App (1st) 200250-U. There, a panel of this court concluded that the defendant did not state an arguable claim of ineffective assistance of appellate counsel, which was premised on trial counsel's failure to present an expert witness on the eyewitness identifications. *Id.* ¶¶ 25-26. The court rejected the defendant's reliance on *Lerma* because his trial occurred before *Lerma* was decided, and instead, found that "there [was] no arguable basis for the conclusion that counsel's performance was deficient because

counsel did not present expert testimony on the reliability of eyewitness identifications." *Id.* ¶ 34. The court also found that the defendant was not prejudiced because trial counsel extensively cross-examined the eyewitness and called into question that identification during closing argument. *Id.* ¶ 36. The court further noted the determination on direct appeal that the identification was reliable and sufficient to establish the defendant's identity. *Id.* ¶ 37. We have come to similar conclusions in the case before us and are not persuaded to deviate from our holding.

¶ 74    Accordingly, we find that the circuit court's summary dismissal of defendant's petition was proper where his claim of ineffective assistance of appellate counsel was forfeited and postconviction counsel's unreasonable assistance did not prejudice defendant.

¶ 75                                    III. CONCLUSION

¶ 76    For the reasons stated, we affirm the judgment of the circuit court.

¶ 77    Affirmed.